UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JEWEL A. WILLIAMS, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
|     vs. ) | Cause No.  1:11-cv-1150-WTL-DKL |
| ) | |
| MICHAEL J. ASTRUE, COMMISSIONER ) | |
| OF SOCIAL SECURITY, ) | |
| ) | |
|     Defendant. ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Jewel A. Williams ("Williams") requests judicial review of the final decision of Defendant Commissioner of the Social Security Administration ("Commissioner"), denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles II and XVI of the Social Security Act (the "Act").  The Court rules as follows.

## I.  PROCEDURAL BACKGROUND

Williams filed for SSI and DIB on August 3, 2007, alleging that she became disabled on April 17, 2007, primarily due to symptoms associated with strokes.  After her applications were denied initially on November 5, 2007, and upon reconsideration on December 13, 2007, Williams requested and was granted a hearing before an Administrative Law Judge ("ALJ").  On January 11, 2010, Williams appeared and testified at a hearing in Indianapolis, Indiana before ALJ Albert J. Velasquez.  At the hearing, Williams was represented by counsel.  On May 19, 2010, the ALJ issued his decision in which he found that Williams was not disabled under the Act because she was able to perform work that existed in significant numbers in the national

economy. On June 23, 2011, the Appeals Council denied Williams' request for review of the ALJ's decision. Williams then filed this timely civil action for review of the ALJ's decision.

## II. SUBSTANTIVE BACKGROUND

### A. Medical Records

Williams is a fifty-one year old woman who worked as a grocery store cashier prior to the alleged onset of her disability. Williams was forty-six years of age on the date of the alleged onset of her disability.

On February 5, 2007, Williams was admitted to the emergency department of Community Hospital – Anderson with an acute onset of left hemisensory deficit that occurred earlier that day. At admission, she stated that the numbness started in her face and worked its way down to her arm and her leg. She also reported experiencing facial pain. Dr. Larry Blankenship, a neurologist, stated that his impression of Williams on admission was that she was experiencing a sensory stroke, likely secondary to right thalamic infarct with risk factors including hypertension, diabetes, and hyperlipidemia, all leading to intracranial occlusive disease. An MRI conducted the following day revealed no evidence of an acute intracranial abnormality or infarct.

On February 21, 2007, Williams was seen at Central Indiana Neurology following her discharge from the hospital. She reported that she felt better but still had weakness in her left arm. On examination, the neurologist found that her head, neck, cranial nerves, gait, speech, and cognition were all within normal limits. The neurologist stated that his impression of Williams was that she had suffered a stroke.

On April 2, 2007, Williams was admitted to the emergency department of St. Vincent's Hospital with complaints of weakness. The admitting papers noted that Williams was

experiencing new weakness, impaired speech, decreased ability to stand/walk, confusion, and trouble concentrating or thinking. The attending physician, Dr. Brad L. Hayes, stated that his clinical impression was "somatic hemiplegia mental stress inducer." Record at 214. A CT scan of Williams' brain performed during the visit was normal. Dr. Hayes' discharge diagnosis was "stress induced plegia of left arm and psychosomatic stroke symptoms." *Id.* at 219.

      Two weeks later, on April 17, 2007, Williams was admitted to the emergency Department of Community Hospital – Anderson complaining of headaches associated with loss of vision over the left hemifield and numbness and tingling on the left side of her body. Dr. Christopher Melin, a neurologist, completed the admitting examination. Dr. Melin noted that Williams appeared clumsy and was experiencing dyspraxia on her left side. Dr. Melin's clinical impression was a lacunar infarct, which is a stroke in a deep area of the brain, hypertension, coronary artery disease, and marked family history of vascular disease at a young age. An MRI taken that day showed no evidence of an acute infarct. Williams was discharged from the hospital four days later with a diagnosis of possible stroke. After her discharge, Williams did not return to work.

      On May 7, 2007, Williams followed up with Central Indiana Neurology in an office visit. She told the neurologist that she had memory problems, constant left occipital headaches and trouble feeling her left leg. She also indicated that she was nervous, short of breath, and tired. The neurologist's clinical impression was stroke, possible obstructive sleep apnea, rule out conversion disorder, and occipital neuralgia.

      On October 12, 2007, Williams was examined by a state agency physician, Dr. Elpidio Feliciano. On examination, Williams' gait was normal and she could get up and down from the examining table. Williams became unsteady when walking on heels and toes. Williams' cranial

nerves 5 and 11 were diminished on the left side of her face.  Williams' muscle strength was 4/5 in the upper extremities and 3/5 in the lower extremities.  Williams' grip strength was 3/5 on the left and 5/5 on the right.  Although Williams had diminished sensation to light touch on the left upper and lower extremities, she could pick up coins with both hands.  Dr. Feliciano found that she had left-sided weakness, fatigue, and receptive aphasia, which is damage to a language center located in a rear portion of the brain.

On October 16, 2007, Williams underwent a mental status evaluation by Robert B. Fischer, Ph.D.  Dr. Fischer noted that Williams reported being forgetful, having comprehension and spatial relationship problems, easily becoming disoriented even in familiar surroundings, and having persistent headaches, prosopagnosia, some word-finding difficulty, and slurring of speech.  He also noted that Williams reported feelings of depression, generalized anxiety, feelings of foreboding, and constant worry.  Dr. Fischer noted that Williams' performance on the Wechsler Memory Scale – III was "clearly in the deficient range." *Id.* at 452.  He summarized her diagnoses as Amnesiac Disorder, Major Depressive Disorder, and Generalized Anxiety Disorder.

On November 3, 3007, Joseph A. Pressner, Ph.D., completed a Mental Residual Functional Capacity Assessment of Williams based upon his review of her medical records.  Dr. Pressner stated that some of Williams' scores on the Wechsler Memory Scale – III administered by Dr. Fischer suggested that Williams may have intentionally distorted her test results.  Dr. Pressner further stated that the reports of functioning in Williams' file suggest that she is capable of understanding, remembering, and carrying out simple instructions.  In addition, Dr. Pressner stated that he believed Williams capable of making simple work related decisions, remembering locations, and remembering simple work-like procedures.  Dr. Pressner further noted that

Williams would have problems with tasks requiring intensive or prolonged concentration. Ultimately, Dr. Pressner concluded that "although [Williams] has a severely limiting condition, it appears that [Williams] retains the ability to perform simple, repetitive tasks on a sustained basis without extraordinary accommodations."[1] *Id.* at 477.

On September 18, 2008, Dr. Frank Campbell, Williams' treating physician, completed a physical residual functional capacity questionnaire. His diagnoses included hypertension, anxiety, and cerebral vascular accident. Dr. Campbell noted that Williams' symptoms included loss of memory, dizziness, and fatigue. He stated that he believed that Williams' depression and anxiety affected Williams' physical condition.

On July 10, 2009, Williams was examined by consultative examiner Carrie Dixon, Ph.D. Dr. Dixon conducted an Adult Mental Status Examination, a Wechsler Memory Scale – III test, a clinical interview, a review of available records, and behavioral observations. Dr. Dixon stated in her report that Williams approached the evaluation in a "semi-cooperative fashion". *Id.* at 783. Dr. Dixon considered the scores that Williams obtained in the Wechsler Memory Scale – III "an invalid representation of [Williams'] true memory skills." *Id.* at 784. It was Dr. Dixon's impression that Williams exhibited a "fake-bad" response style. *Id.* Dr. Dixon included a diagnosis of Depressive Disorder, not otherwise specified, in her report.

## B. Hearing Testimony

Williams testified regarding her impairments during her hearing before the ALJ on January 11, 2010. At the time of the hearing, Williams was forty-eight years old and had not

---

[1] The Court notes that this opinion is not particularly helpful to the Commissioner or the Court, inasmuch as there is no way to know what Dr. Pressner believes are "extraordinary accommodations" and thus no way of knowing whether there are accommodations that he believes Williams would need that he views as non-extraordinary but that would nonetheless prevent Williams from performing substantial gainful activity.

5

worked since April 17, 2007. She testified that she stopped working after she had the last of three strokes. Williams stated that she could not return to her job as a grocery store cashier because she could not "concentrate long enough to even do anything." *Id.* at 36. She testified that she had trouble sleeping at night and had to nap during the day.[2] She stated that she had headaches every day and the headaches required her to lay down two or three times a week, sometimes all day. She stated that her headache medication made her dizzy.

On a "good day" Williams stated that she will try to make her bed, do some cleaning, and do some laundry. *Id.* at 39. Williams also stated that she cooks for herself, drives to the grocery, drives to medical appointments, and visits friends on good days. On bad days, Williams testified that she had to stay in bed or on her couch.

Williams testified that in addition to her physical difficulties she had some depression, but her medication helped. Williams stated that her depression would "at times" affect her ability to work, but that there were times when it would not affect her at all. *Id.* at 44.

### C. Opinion of the Vocational Expert

On January 19, 2010, the ALJ submitted interrogatories to vocational expert Ray O. Burger ("Burger") in which he asked Burger to consider a hypothetical individual who was Williams' age and had the same education and work experience as Williams. The hypothetical individual was able to lift and carry twenty pounds occasionally and ten pounds frequently, and could stand and walk for six out of eight hours and sit for about six out of eight hours. She could only occasionally balance, stoop, kneel, crouch, crawl, or climb stairs and ramps, and she could never climb ropes, ladders, or scaffolds, or work at unprotected heights, around dangerous

---

[2]Curiously, the ALJ states in his decision that Williams "seems to be able to watch TV during the day uninterrupted by daytime sleepiness." Record at 17. In fact, when asked at the hearing if she sleeps during the day, Williams testified that "I'll take a nap. I'll be sitting thinking I'm just fine and just doze off and go to sleep."

moving machinery, or around open flames and large bodies of water. She also could not operate a motor vehicle. Work she performed had to be simple and repetitive and could not require more than occasional pushing and pulling with the lower left extremity or more than frequent feeling with the left, non-dominant, hand. Burger responded that the hypothetical worker could perform work as a stocker, food preparation worker, and mail clerk.

### III. APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any other kind of gainful employment that exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled, despite her medical condition and other factors. 20 C.F.R. § 404.1520(b).[3] At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-

---

[3]The Code of Federal Regulations contains separate sections relating to DIB and SSI that are identical in all respects relevant to this case. For the sake of simplicity, this Entry contains citations to DIB sections only.

7

month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 404.1520(g).

On review of the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). The ALJ must articulate his analysis of the evidence in his decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into his reasoning . . . [and] build an accurate and logical bridge from the evidence to his conclusion." *Id.*

## IV. THE ALJ'S DECISION

The ALJ found that Williams met the disability insured status requirements of the Act at all times relevant to the decision and that Williams had not engaged in substantial gainful activity since April 17, 2007, the alleged onset date. The ALJ further found that Williams' depression "does not cause more than minimal limitation" in Williams' ability to perform basic

mental work activities. Accordingly, the ALJ concluded that Williams' medically determinable mental impairment of depression was not severe.

In finding that Williams' depression was not a severe medically determinable mental impairment, the ALJ examined the four functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments. *See* 20 C.F.R. pt. 404, subpt. P, appx. 1. The ALJ found that in the functional areas of daily living, social functioning, and concentration, persistence or pace, the ALJ found that Williams had mild limitations. In the fourth functional area of episodes of decompensation, the ALJ found that Williams had not experienced any episodes of decompensation of extended duration. The ALJ concluded that because Williams' medically determinable mental impairment caused no more than "mild" limitation in any of the first three functional areas and she had experienced no episodes of decompensation of extended duration in the fourth area, her medically determinable mental impairment was nonsevere.

The ALJ found that Williams had the following severe impairments: obstructive sleep apnea, hypertension, late effects of a mild cerebral vascular accident ("CVA"), occipital neuralgia, and obesity. The ALJ found that Williams did not have an impairment or combination of impairments that met or medically equaled any of the impairments included in the Listing of Impairments.

The ALJ then concluded that Williams had the residual functional capacity ("RFC") to perform light work with the following restrictions:

> lift/carry twenty pounds occasionally and ten pounds frequently; sit/stand/walk for six of eight hours; occasional climbing stairs/ramps; no climbing ropes/ladders/scaffolds; no more than occasional balancing, stooping, kneeling, crouching, crawling; no work at unprotected heights, around dangerous moving machinery, operating motor vehicle [sic.], being around open flames and large bodies of water; only simple, repetitive tasks; no more than occasional pushing

9

>and pulling with the lower left extremity and no more than frequent feeling with the left (non-dominant) hand.

Record at 14. The ALJ then found that, given her RFC, Williams could not perform any of her past work, but that she could perform other jobs that existed in significant numbers in the national economy and, therefore, was not disabled.

## V. **DISCUSSION**

Williams advances several objections to the ALJ's decision. Each is addressed below.

### A. ALJ's Treatment of Williams' Mental Impairments

Williams contends that the ALJ erred in failing to find that she suffers from the severe impairments of organic mental disorder, anxiety related disorder, and depression. The ALJ found that she suffered from depression but that it was not "severe" as defined by the Act, and he did not acknowledge the fact that Williams has been diagnosed with organic mental disorder and anxiety related disorder.

The Commissioner correctly notes that whether the ALJ considers a particular impairment "severe" at step two is not reversible error as long as he continues to step three. *See Arnett v. Astrue*, 676 F.3d 586 (7th Cir. 2012) (holding that as long as the ALJ finds at least one severe impairment at step two, omission of other severe impairments is harmless because "Step 2 is a threshold issue only"). This is because even if the ALJ determines that an impairment is not severe, he must include any limitations caused by that impairment in his determination of the claimant's RFC. *See* SSR 96-8p.

In this case, Williams argues that the ALJ failed properly to consider the effect of her mental impairments on her RFC. Specifically, she notes that consultative examiner Dr. Fischer and non-examining consultant Dr. Pressner both concluded that she suffered from memory difficulties, major depressive disorder, and generalized anxiety disorder. Dr. Pressner found that

she had a "severely limiting [mental] condition" and opined that as a result she was moderately limited in her ability to maintain attention and concentration for extended periods, that she had moderate restrictions in her activities of daily living, that she had moderate difficulties in maintaining concentration, persistence, and pace, and that she was markedly limited in her ability to understand, remember and carry out detailed instructions. Record at 461-77. Dr. Fischer similarly opined that she had memory problems and that "difficulties are expected pretty much across the board with employment, access to healthcare, social group, quality of life." *Id.* at 452.

The ALJ did not mention Dr. Pressner's report in his decision. He acknowledged Dr. Fischer's findings, but rejected them in favor of the other consultative examiner, Dr. Dixon, who opined that Williams' score on the Wechsler Memory Scale test she administered indicated a "fake-bad" response style; in other words, Williams was intentionally trying to make her impairments appear worse than they really were. The problem is that the ALJ rejected Dr. Fischer's findings because he found them to be "based on subjective complaints" when, in fact, Dr. Fischer administered the same Wechsler Memory Scale test that Dr. Dixon administered. The ALJ also opined that Dr. Dixon's finding that Williams exaggerated her symptoms when she examined her "certainly suggests that this could have been present in the first examination as well." Record. at 17. Unfortunately, the ALJ points to nothing other than his own gut instinct that indicates that this is the case.[4]

There may well be substantial evidence on the record to support the ALJ's determination that Williams' mental impairments affect her RFC only to the extent the she is limited to simple,

---

[4] The Court is troubled by the ALJ's statement that Williams "alleges that she is easily disoriented, has comprehension problems, word finding difficulty and slurring of speech, but I note these symptoms are not alluded to in any of the number of examinations reviewed here." Record at 17. That statement is false; as the ALJ acknowledges in the very next sentence, many of those symptoms were acknowledged by Dr. Fischer.

11

repetitive tasks.  As noted above, however, the ALJ is required to "provide some glimpse into his reasoning . . . [and] build an accurate and logical bridge from the evidence to his conclusion." *Scheck*, 357 F.3d at 700.  With regard to Williams' mental impairments, the ALJ failed to do so in this case.  Remand is thus required.

### B. Credibility Determination

Williams argues that the ALJ erred in evaluating the credibility of her allegations regarding her symptoms.  The Court agrees.

In assessing a claimant's credibility, an ALJ must consider several factors, including daily activities; the location, duration, frequency, and intensity of symptoms; precipitating and aggravating factors; medications taken; and treatment.  SSR 96-7p.  In assessing the credibility of the claimant, the ALJ need not cite findings on every factor, but the ALJ must articulate the reasons for her decision in such a way as to "make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003) (citing SSR 96-7p).  In other words, the ALJ is required to "build and accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).  "In analyzing an ALJ's opinion for such fatal gaps or contradictions, [the court] give[s] the opinion a commonsensical reading rather than nitpicking at it." *Id.*  Accordingly, an ALJ's credibility finding is entitled to "considerable deference" and will be overturned only if it is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (internal quotations omitted).

The "commonsensical" reading of the ALJ's credibility determination is that he placed great weight on the fact that Williams' MRI and CT scan were normal.  He mentions that fact six times in his decision.  Absent from his decision is any reference to any medical evidence that a

person with the symptoms alleged by Williams would have abnormal MRI or CT scan results. The ALJ apparently is satisfied that Williams actually suffered strokes and symptoms as a result of the strokes, inasmuch as he found "late effects of a mild cerebral vascular accident" as one of her severe impairments. If the strokes themselves failed to show up as abnormalities on MRI and CT scans that were taken immediately after she suffered them, it is unclear why the ALJ believes that the lack of such abnormalities is inconsistent with the symptoms alleged by Williams. Given the centrality of this unsupported assumption to the ALJ's credibility finding, the Court agrees with Williams that the ALJ should reassess that finding on remand, applying the appropriate factors as set forth in SSR 96-7p.

### C.  Weight Accorded to Williams' Treating Physician's Opinion

Williams argues that the ALJ erred in his treating of the opinion of Williams' treating physician, Dr. Campbell.  Pursuant to the "treating physician rule,"

> A treating physician's opinion that is consistent with the record is generally entitled to "controlling weight." 20 C.F.R. § 404.1527(d)(2); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010).  An ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection. 20 C.F.R. § 404.1527(d)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir.2007).

*Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011).  "'If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion."  *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (quoting *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir.2009) (citing 20 C.F.R. § 404.1527(d)(2)).   However, the ultimate determination of disability is a legal matter reserved to the Commissioner, and "[a] statement by

a medical source that [a claimant] is 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [the claimant is] disabled." 20 C.F.R. § 404.1527(e).

The ALJ notes that Dr. Campbell, Williams' treating physician twice stated that Williams was unable to work. However, the ALJ also correctly notes that Dr. Campbell gave no basis for that opinion. Indeed, it is entirely unclear what symptoms Dr. Campbell believes Williams has that prohibit her from working. In fact, in the most recent report from Dr. Campbell in the record, a June 10, 2009, Physical Residual Capacity Questionnaire, he answered "not known" to virtually all of the questions regarding Williams' ability to engage in various work activities. Dr. Campbell's opinion simply does not have enough substance to it to be entitled to controlling weight, or any weight. The ALJ did not err in his consideration of it.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner is **REVERSED and REMANDED** for further consideration consistent with this Entry.

SO ORDERED:   09/10/2012

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic distribution.